SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN M. ARKOW (California State Bar No. 143755)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6975
     Facsimile: (213) 894-6269
     E-mail:    steven.arkow@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 14-512-SJO-3 |
|---|---|
| Plaintiff, | GOVERNMENT RESPONSE TO DEFENDANT SRI WIJEGOONARATNA'S SENTENCING POSITION; EXHIBIT |
| v. | |
| SRI WIJEGOONARATNA, | Sentencing: July 7, 2017 |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Steven M. Arkow, files the Government Response to Defendant Sri Wijegoonaratna's Sentencing Position.

//

Case 2:14-cr-00512-SJO Document 407 Filed 06/29/17 Page 2 of 15 Page ID #:5378

The government's response is based upon the attached memorandum of points and authorities, the files and records in this case, the (revised) Presentence Report, and such further evidence and argument as the Court may permit.

Dated: June 29, 2017

Respectfully submitted,

SANDRA R. BROWN
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*/s/ Steven M. Arkow*
STEVEN M. ARKOW
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES...................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   INTRODUCTION......................................................1

II.  THE PSR GUIDELINES CALCULATION OF LOSS IS SUPPORTED BY THE
     LAW AND EVIDENCE..................................................3

     A.   Applicable Law re: Burden of Proof for Loss
          Enhancement at Sentencing....................................3

     B.   Defendant's Loss is Based on Claims Tainted by His
          Fraud........................................................5

III. CONCLUSION.......................................................10

**TABLE OF AUTHORITIES**

**FEDERAL CASES:**                                                            **Page(s)**

United States v. Armstead,
    552 F.3d 769 (9th Cir. 2008) .................................. 5

United States v. Berger,
    587 F.3d 1038 (9th Cir. 2009) ................................. 4

United States v. Gambaryan,
    645 Fed. App'x. 888 (9th Cir. 2016) ........................... 4

United States v. Garro,
    517 F.3d 1163 (9th Cir. 2008) ................................. 4

United States v. Hymas,
    780 F.3d 1285 (9th Cir. 2015) ................................. 4

United States v. Johnson,
    540 F. App'x 573 (9th Cir. 2013) .............................. 5

United States v. Munoz,
    233 F.3d 1117 (9th Cir. 2000) ................................. 3

United States v. Popov,
    742 F.3d 911 (9th Cir. 2014) ........................... 4, 6, 10

United States v. Riley,
    335 F.3d 919 (9th Cir. 2003) .................................. 5

**FEDERAL STATUTES:**

18 U.S.C. § 3553 ................................................. 1

**UNITED STATES SENTENCING GUIDELINES:**

U.S.S.G. § 1B1.3(a)(1)(B) ........................................ 6

U.S.S.G. § 2B1.1 ................................................. 2

U.S.S.G. § 2B1.1(b)(1)(J) ..................................... 1, 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

On June 19, 2017, the government filed the government's sentencing position (ECF No. 403) and defendant filed defendant's sentencing position (ECF No. 404).  Defendant objected to the 18-level increase to his advisory guidelines offense level arising from the calculation of the loss pursuant to U.S.S.G. § 2B1.1(b)(1)(J), contending that the loss should be limited to only the minimal fraud loss of the claims identified in the seven substantive counts of conviction presented at trial and the Court should disregard that defendant was convicted of a larger scheme to defraud Medicare.  (ECF No. 404 at 16-17).[1]

On June 22, 2017, the United States Probation Office filed a revised Presentence Investigation Report (revised "PSR") (ECF No. 405) and an Addendum to the PSR (ECF No. 406).  The Probation Officer rejected defendant's position that the fraud loss should be limited to the seven claims.  First, the PSR Addendum noted that "[t]he court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique positon to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference."  (ECF No. 406 at 2, citing U.S.S.G. § 2B1.1, Application Note 3(C)).  Further, defendant is accountable for his own behavior, as well as in the case of a jointly undertaken criminal activity, such as here, all acts and

---

[1] Defendant's objection to the PSR on June 19, 2017 is untimely. The PSR (ECF No. 291) was disclosed 12 months ago.  See Fed. R. Crim. P. 32(f)(1) ("Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report").

omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (iii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with the criminal activity." Id., citing U.S.S.G. § 2B1.1, Application Notes 2 and 3.

All fraudulent claims submitted by California Hospice Care ("CHC") in which defendant was the attending physician are part of the charged scheme conduct. (ECF Nos. 291 (PSR) and 405 (revised PSR) ¶¶ 49, 53 and 68). The loss amount used in the PSR to calculate defendant's offense level "is based on the total amount billed [to] Medicare and Medi-Cal attributable to [defendant] for patients alive" when they were discharged from CHC, meaning they were not terminally ill with a life expectancy of six months or less when defendant initially certified or re-certified them.

Because the government has filed its more comprehensive sentencing position addressing some of defendant's other claims, this response is confined to respond to defendant's sentencing claim that the loss should be limited to seven claims.[2] Defendant's argument is based on the mistaken premise that the two-week trial was about only

---

[2] Defendant argues for a sentence of 36 months, substantially below his advisory guidelines range of 108-135 months, claiming that the statutory factors under 18 U.S.C. § 3553(a) militate in favor of an extraordinarily lower sentence. (ECF No. 404 at 9-18). The government's sentencing position previously addressed these factors: the seriousness of the overall scheme, defendant's role as the associate medical director and a licensed doctor enrolled in Medicare who abused his position of trust to fraudulently certify vulnerable Medicare beneficiaries as terminally ill in exchange for illegal kickbacks and other payments, aggravated by defendant's repeated criminal conduct in unrelated schemes, all weigh in favor of a substantial custodial sentence within the middle to high-end of defendant's advisory guidelines range. The government reserves the right to supplement this argument at defendant's sentencing. (ECF No. 403 at 8-20).

2

the executions of the CHC health care fraud scheme for the seven substantive counts, when, to the contrary, the evidence presented concerned the entirety of the fraud that permeated CHC. As the government summarized the evidence in closing argument, CHC "was a hospice fraud factory that billed millions of dollar through fraud, lies and deceit, and the fraud was not limited to one or two individuals [or] several isolated instances or to an occasional mistaken clinical judgment about how sick a Medicare beneficiary really was." See Reporter's Transcript of Trial Proceedings ("R.T.") 5/2/16 (Day 10) at 2068).

Based on the case law and evidence discussed below, defendant's attempt to minimize his conduct to argue for a sentence of 36 months, far below his advisory guidelines range (108-135 months) and below the sentences of his principal co-schemers, Priscilla Villabroza (96 months) who, unlike defendant, pleaded guilty prior to trial and accepted responsibility and Boyao Huang (48 months) who, unlike defendant, was not the associate medical director, did not receive illegal kickbacks, was involved with less than half as many beneficiaries and half the billings as defendant over a much shorter period of time, and has no criminal history, should be rejected.

**II. THE PSR GUIDELINES CALCULATION OF LOSS IS SUPPORTED BY THE LAW AND EVIDENCE**

    A.    <u>Applicable Law re: Burden of Proof for Loss Enhancement at Sentencing</u>

As a threshold matter, defendant incorrectly contends that the government is required to prove the applicable loss at sentencing by a clear-and-convincing standard because the determination of that loss will have a disproportionate impact on the ultimate sentence. (ECF No. 404 at 18).

3

Factual findings underlying sentencing enhancements must generally be supported by a preponderance of the evidence. United States v. Munoz, 233 F.3d 1117, 1126 (9th Cir. 2000). This standard applies in fraud cases to loss findings that are based on the extent of the charged conspiracy or scheme to defraud, even where the loss amount will have a disproportionate effect on the sentence. See United States v. Popov, 742 F.3d 911, 914 (9th Cir. 2014) (preponderance standard applies to losses from convictions for health care fraud and conspiracy to commit health care fraud); United States v. Berger, 587 F.3d 1038, 1048 (9th Cir. 2009) (preponderance of evidence standard applies where loss based on extent of fraud conspiracy); United States v. Garro, 517 F.3d 1163, 1168-69 (9th Cir. 2008) (rejecting plain-error claim that clear-and-convincing evidence required for losses associated with wire fraud scheme).

Defendant's contention that a clear-and-convincing evidence standard applies fails to acknowledge this precedent and relies on two inapposite cases. (ECF No. 404 at 18-19). United States v. Hymas, 780 F.3d 1285, 1291 (9th Cir. 2015) (requiring clear-and-convincing standard but emphasizing that defendant was not charged with a conspiracy to defraud that included others acts of fraud and was not convicted of a scheme to defraud that involved multiple transactions); United States v. Gambaryan, 645 Fed. Appx. 888, 890 (9th Cir. 2016) (unpublished opinion) (the applicable burden of proof was not raised as an issue that was litigated and the parties did not object to the higher standard).

In this case, nonetheless, based on the considerable evidence at trial and as discussed in the government's prior sentencing filing and below, the government prevails on the reasonableness of the

4

estimate of the PSR guidelines loss calculation under either standard.

### B. Defendant's Loss is Based on Claims Tainted by His Fraud

The PSR guidelines loss calculation is based on charged conduct for which defendant was convicted. Defendant was convicted of a scheme to defraud health care between June 2010 and April 2013, by causing the submission of false and fraudulent claims for medically unnecessary hospice care. The scheme evidence is not limited to merely seven claims and, accordingly, the guidelines loss calculation should not be limited to seven claims.

Consistent with the guidelines and case law, the guidelines loss calculation encompasses conduct within the scope of the charged scheme for which he was convicted. The loss is not dependent on conduct distinct from the crimes of conviction, the health care scheme, but rather arises directly from the scheme. See United States v. Johnson, 540 Fed. Appx. 573 (2013) at *4) (finding that the district court did not err in applying a preponderance-of-the-evidence standard when determining the loss amount since the defendant had been convicted of thirty-four counts of health care fraud all arising from the same scheme); United States v. Armstead, 552 F.3d 769, 778 (9th Cir. 2008) (preponderance-of-the- evidence standard was appropriate because "sentencing enhancements were based entirely on the extent of the conspiracy and do not require the heightened standard of proof"); United States v. Riley, 335 F.3d 919, 926 (9th Cir. 2003) (the fact that an enhancement is based on the extent of a conspiracy for which the defendant was convicted weighs heavily against the application of the clear and convincing evidence standard of proof. Only in situations where the enhancement is based

5

on uncharged or acquitted conduct does the clear and convincing standard of evidence apply). To this last point, defendant does not claim that the loss calculation is based on uncharged or acquitted conduct.

Because the government charged, and the defendant was convicted of, an extensive scheme to defraud, the loss encompasses claims within the scheme, including those losses attributable to acts of others within the scope and furtherance of the jointly undertaken criminal activity.[3] U.S.S.G. § 1B1.3(a)(1)(B). Acts are part of the common scheme or plan if they are "substantially connected to [the offense] by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*."

---

[3] The indictment specifically charges defendant with participating in a scheme to defraud that encompasses more than merely seven claims: "Between in or about March 2009 and in or about June 2013, [defendant and other co-schemers] submitted and caused to be submitted false and fraudulent claims to Medicare and Medi-Cal for hospice-related services in the amounts of approximately $6,861,346 and $2,049,356, respectively" which totals $8,910,702 (ECF No. 1 (Indictment) at 12, ¶ B(27)(y)). Further, the indictment alleges: "In fact, and as [defendant] then well knew from examining the beneficiaries and reviewing the beneficiaries' medical records, the overwhelming majority of California Hospice beneficiaries were not terminally ill." Id. at 11, ¶ B(27)(s). The PSR guidelines loss calculation for defendant is relatively conservative because it does not hold defendant accountable for the entirety of the loss caused by CHC, but cabins the loss to only those claims in which defendant is the attending physician, and not where others, like co-defendant Huang was the attending physician. By comparison, co-schemer Priscilla Villabroza, the owner of CHC, was held responsible for the entire fraud loss. She admitted and was sentenced based on a loss amount of "$8,910,702, which is the total amount of the fraudulent claims defendant [Villabroza] submitted and caused to be submitted to Medicare and Medi-Cal for medically unnecessary hospice-related services purportedly provided by California Hospice." (ECF No. 144 (Villabroza's Plea Agreement) at 13). In addition, she admitted that CHC "received few, if any, referrals from the primary care physicians of beneficiaries, but rather paid marketers, including defendant, to recruit and admit beneficiaries into hospice so CHC could bill Medicare. Id. at 11. This evidence supports the PSR guidelines loss calculation, taking into account defendant's particularized contribution and role in the overall scope of the fraud at CHC.

U.S.S.G. § 1B1.3, Application Note 9(A). <u>See also</u> <u>Popov</u>, 742 F.3d at 916-917 (discussing that the focus is on the acts for which a defendant should be held accountable rather than criminally liable."

The PSR guidelines loss calculation is centered on the way CHC operated its hospice fraud in conducting its business and relies on considerable summary evidence reviewed by the case agents regarding CHC's claims and patient files, as well as testimony from beneficiaries and their primary care physicians about both the charged executions and other false statements as to their medical conditions in the patient charts used to perpetuate the fraud, and testimony from CHC nursing staff and employees, several of whom testified at trial. All of this evidence implicates defendant's critical participation in the scheme.

Co-defendant Sharon Patrow, on-site owner of CHC, who pleaded guilty and testified at trial also confirmed CHC's fraudulent business model in that CHC received few, if any, referrals from the real doctors of the beneficiaries. (ECF No. 130 (Patrow's Plea Agreement) at 14). Rather, CHC paid patient marketers, including defendant, illegal kickbacks for referring beneficiaries so they would be admitted into hospice. <u>Id.</u> at 14-15. She stated that defendant falsely certified that beneficiaries were terminally ill, when the overwhelming majority of the recruited beneficiaries were not terminally ill. <u>Id</u>.

Jean Stone, the longtime Medicare employee, testified that recruiting patients by paying kickbacks is prohibited by the Medicare program, thereby, tainting those claims where the patients were procured that way, which, as noted above, was how CHC ran its operation. (R.T. 4/20/16 (Day 2) at 356).

Not only were CHC beneficiaries procured by fraud from the outset, but neither CHC nor defendant conducted any medical due diligence to justify a diagnosis of a terminal illness. This deficiency was not limited to seven claims. Defendant's contention that defendant acted in good faith and simply erred because determining that a given beneficiary had a life expectancy of six months or less is "an inexact science" is unavailing and unavailable to defendant since defendant employed no science and was not practicing medicine. (ECF No. 404 at 19).

CHC's business model was to admit beneficiaries through paying illegal kickbacks to marketers, including defendant – certainly not a starting sign for a good-faith exercise of medical practice. Moreover, a review of CHC patient files for patients identified in claims where defendant himself was the attending physician and certified the beneficiaries were terminally ill which was used to calculate the loss showed that the files did not contain legitimate physician referrals. See ECF No. 403-1 at 8 (Declaration of Special Agent Alison Davis ¶ 27 attached to Government Sentencing Position). In addition, the CHC patient files did not contain records from hospitals, facilities, or physicians indicating there was a medical basis upon which defendant could base a diagnosis of terminal illness for the beneficiaries. Id. at 8-9.

Defendant's responsibility at CHC was not limited to being the attending physician for only those beneficiaries he personally examined, but he was the CHC Associate Medical Director dating to at least November 2009 and attended the team meetings where the medical prognosis and certifications/re-certifications of beneficiaries was determined. Id. (Declaration of Alison Davis ¶¶ 22, 25). The jury,

under a higher reasonable doubt standard, was not misled by defendant's same argument that his certifications of terminal illness, although mistaken, were made in good faith; similarly, this Court should not credit it at sentencing.

Defendant's claim that the government has not shown that defendant recertified the beneficiaries relating to the claims he is being held accountable for is not correct. (ECF No. 404 at 19). The loss calculation is based on those claims submitted for beneficiaries in which defendant was listed as the attending physician. See ECF No. 403-1 at 3 (Declaration of Special Agent Alison Davis ¶ 10 attached to Government Sentencing Position). In other words, if another physician was the attending physician for a specific claim, then defendant was not held responsible for the loss associated with that claim. This approach reflects the conservative nature of the loss calculation, since, as noted above, a defendant can be held responsible for the acts of his co-schemers.

Finally, defendant's claim that the government did not show that defendant recertified most of his patients is not accurate and is misleading. With respect to the beneficiaries associated with the seven specific claim counts proved at trial, defendant conducted the initial medical visit and certified each and every one of the seven beneficiaries as terminally ill. See Government Trial Exhibit 19 (attached as Exhibit "A" in redacted form) (R.T. 4/26/16 (Day 6) at 1304-06). Further, defendant recertified six of those seven beneficiaries as terminally ill for subsequent hospice enrollment, indicating that defendant recertified most of the beneficiaries he initially admits. Id.

Capturing the full scope of defendant's fraud, the government has summarized the fraudulent billing which defendant has not rebutted. The guidelines provide that "[i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute *prima facie* evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted." (ECF No. 405 67, citing U.S.S.G. § 2B1.1(b)(1), Application Note 3(F)(viii) [Federal Health Care Offenses Involving Government Health Care Programs]. (ECF No. 404 at 19). As stated in Popov, 742 F.3d at 916: "In light of the express instructions in the current Guidelines and the way in which the burden shifting framework has been applied by our sister circuits, we now join those courts. In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes. If not rebutted, this evidence shall constitute sufficient evidence to establish the intended loss by a preponderance of evidence."

**III. CONCLUSION**

For all the foregoing reasons, the evidence has shown that defendant participated in an extensive fraud at CHC -- beyond seven claims -- and should be held accountable for the losses based on claims CHC in which defendant falsely certified beneficiaries as terminally ill. Accordingly, the PSR correctly calculated an 18-level fraud loss increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J) based on the total amount CHC billed to Medicare ($3,127,404.65) and Medi-Cal ($887,584.53) directly attributable to defendant for patients who

were still alive at discharge from CHC, namely, a total of $4,014,989.18 (ECF Nos. 405 and 291 ¶ 68), resulting in an advisory guidelines offense level of 31 (108-135 months).